# United States Court of Appeals for the Federal Circuit

---

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, on its own behalf,** AND **MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, as successor to CONNECTICUT MUTUAL LIFE INSURANCE COMPANY,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2014-5019

---

Appeal from the United States Court of Federal Claims in No. 1:07-cv-00648-MBH, Judge Marian Blank Horn.

---

Decided: April 9, 2015

---

BERNARD JOHN WILLIAMS, JR., Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, argued for plaintiff-appellee. Also represented by DAVID W. FOSTER, ALAN J. SWIRSKI, PAUL MCLAUGHLIN.

ARTHUR THOMAS CATTERALL, Tax Division, United States Department of Justice, Washington, DC, argued

for defendant-appellant. Also represented by ROBERT WILLIAM METZLER, TAMARA W. ASHFORD.

---

Before LOURIE, MOORE, and O'MALLEY, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

The government appeals a judgment of the United States Court of Federal Claims in favor of Massachusetts Mutual Life Insurance Company ("MassMutual") and Connecticut Mutual Life Insurance Company ("ConnMutual"). The Court of Federal Claims ruled that MassMutual and ConnMutual were legally authorized to deduct policyholder dividends from their 1995, 1996, and 1997 tax returns in the year before the dividends were actually paid. *See Mass. Mut. Life Ins. Co. v. United States*, 103 Fed. Cl. 111 (2012). The parties agree that both companies may deduct the policyholder dividend payments at some point. They dispute the timing of the deductions, however; they debate whether the deductions may be taken in the year the insurance companies guaranteed the dividends, or may only be taken the following year—when the dividends were actually distributed to the policyholders.

The government contends that, because the liability to pay the dividends at issue is contingent on other events, such as a policyholder's decision to maintain his or her policy through the policy's anniversary date, the liability has not been established in the year the dividends were determined. Because a liability must be fixed before it can be deducted, the government argues that MassMutual and ConnMutual could not deduct their obligations until the following year. Even if the liability was fixed, the government alleges that these payments still could not have been deducted until the year they were actually paid because the dividends did not qualify as rebates or refunds, which would meet the recurring item exception to

the requirement that economic performance or payment occur before a deduction may be taken.

Because we find that MassMutual's and ConnMutual's policyholder dividends were fixed in the year the dividends were announced, that the dividends in question are premium adjustments, and that premium adjustments are rebates, thereby satisfying the recurring item exception, we affirm.

## BACKGROUND

Under the tax code, one can elect to recognize revenues and liabilities using different accounting methods, such as the "cash receipts and disbursement method" and the "accrual method." *See* 26 U.S.C. § 446(c). If a taxpayer uses the accrual method, which life insurance companies usually employ,[1] an expense can be deducted in the year in which the liability is incurred, as opposed to the year in which it is paid. In order to determine if a liability has accrued during a taxable year, one must determine if the liability satisfies the "all events" test and if economic performance or payment of the liability has occurred. 26 U.S.C. § 461(h)(1),(4); *see also United States v. Gen. Dynamics Corp.*, 481 U.S. 239, 243 n.3 (1987). The liability satisfies the "all events" test when "all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy." 26 U.S.C. § 461(h)(4). If all three

---

[1]    *See* 26 U.S.C. § 811(a) ("All computations entering into the determination of the taxes imposed by this part [upon life insurance companies] shall be made [] (1) under an accrual method of accounting, or (2) to the extent permitted under regulations prescribed by the Secretary, under a combination of an accrual method of accounting with any other method permitted by this chapter.").

conditions are satisfied, the expense may be deducted before it is paid.

There are exceptions to this general principle, however.  For example, if the liability is "recurring in nature and the taxpayer consistently treats items of such kind as incurred in the taxable year in which [the all events test is met]," then a taxpayer may deduct it during any taxable year wherein the all events test is met, if the liability "is not a material item, or the accrual of such item in the taxable year in which the requirements of [the all events test] are met results in a more proper match against income than accruing such item in the taxable year in which economic performance occurs."  26 U.S.C. § 461(h)(3).  Further, economic performance with respect to that liability must "occur[] within the shorter of—a reasonable period after the close of such taxable year, or 8 1/2 months after the close of such taxable year."  *Id*.  Therefore, if a taxpayer can demonstrate that economic performance will occur within a certain time frame in the next taxable year, that the liability is recurring, and either that the item is immaterial or that the accrual of the liability in a particular taxable year results in a better matching of the deduction with the income to which it relates ("the matching requirement"), the liability can be treated as incurred during that taxable year.  *Id*.; 26 C.F.R. § 1.461-5.

Under Treasury Regulations, certain liabilities are deemed to meet the matching requirement without further consideration.  These liabilities include rebates and refunds.  26 C.F.R. § 1.461-5(b)(5)(ii) ("In the case of a liability described in paragraph (g)(3) (rebates and refunds) . . . of § 1.461-4, the matching requirement . . . shall be deemed satisfied.").

## A. Disputed Insurance Policies

MassMutual is a mutual life insurance company based in Massachusetts.  In 1996, MassMutual merged

with ConnMutual, with MassMutual emerging as the surviving entity.[2]  For tax purposes, MassMutual was an accrual basis taxpayer for the relevant tax years of 1995, 1996, and 1997 and, before the merger, ConnMutual was also an accrual basis taxpayer for the 1995 tax year.

Mutual life insurance companies, such as MassMutual, operate for the benefit of their policyholders, and do not have a separate group of shareholders.  These companies typically offer policyholders two types of insurance plans: participating and non-participating policies.  A participating policy is an insurance policy that is eligible to receive a portion of any distribution of the company's yearly surplus, while a non-participating policy is ineligible to receive such a share.

A mutual insurance company often will conservatively set premiums for its policyholders to ensure that the company will have sufficient funds to pay all benefits, even under extreme circumstances.  This amount typically exceeds the funds necessary to cover the company's operating expenses and contractual obligations, resulting in a surplus.  At the end of each year, the company will calculate the portion of its total surplus, known as the divisible surplus, which it will return to the participating policyholders in the form of policyholder dividends or a credit towards the policyholder's next insurance premium.  This figure is approved by the company's board of directors when set and is then distributed to policyholders the following year.

------

[2]    Unless otherwise noted in the opinion, a discussion of MassMutual includes both MassMutual and ConnMutual, since the two parties merged in 1996, and essentially were treated as the same entity by the parties and by the Court of Federal Claims.

For most participating plans, including MassMutual's, dividends are only payable to those policyholders whose policies are in force as of the anniversary date of the policy. A policy is considered in force if the premium for the policy has been paid through its anniversary date.

Under the Tax Code, such policyholder dividends are deductible from a life insurance company's gross income. 26 U.S.C. § 801(b). Specifically, Section 808(c) permits life insurance companies to deduct these payments in "an amount equal to the policyholder dividends paid or accrued during the taxable year." 26 U.S.C. § 808(c). In 1995, MassMutual implemented a policy of guaranteeing a minimum amount of dividends ("guaranteed dividends") it would pay the following year to a defined class of eligible policyholders—those with post-1983 policies.[3] The board of directors determined the guaranteed dividend each year, and passed resolutions memorializing this figure. MassMutual believed that this guarantee would fix the expense, such that the dividend would be considered accrued for tax purposes, because so long as there was at least one member of the defined class known by December 31 of the taxable year, it was certain that the entire guaranteed dividend would be paid the following year. In other words, because the guaranteed payment was guaranteed to an entire class of policyholders on a pro rata basis, if even one class member was eligible for receipt of a dividend, that class member would receive the

---

[3] There is a distinction between pre- and post-1983 policies, because the tax implications for pre-1983 policies differ because of a statutory change implemented in 1984. This change, however, does not impact the policies at issue here. For a more detailed explanation of the tax consequences related to pre-1983 policies, see *Mass. Mut. Life Ins. Co. v. United States*, 103 Fed. Cl. at 115–16 (2012) and 26 U.S.C. § 808(f).

entire guaranteed amount. Because at least one such class member could be identified by December 31 in each year the guarantees were set, MassMutual believed its payment liability was thus established, regardless of the number of policyholders who might ultimately share in that guarantee. ConnMutual adopted a similar policy in 1995.

In light of this new policy, during the relevant tax years of 1995, 1996, and 1997, MassMutual (and ConnMutual for 1995) deducted from its tax refunds the portion of the guaranteed dividend that would be paid by September 15 of the next year in the year the dividend was guaranteed, believing this deduction complied with the Tax Code and Internal Revenue Service ("IRS") regulations. *See* 26 U.S.C. § 461(h)(3)(A)(ii); 26 C.F.R. § 1.461–5(b)(ii) ("Economic performance with respect to the liability occurs on or before the earlier of (A) [t]he date the taxpayer files a timely . . . return for that taxable year; or (B) [t]he 15th day of the 9th calendar month after the close of that taxable year.").

For example, MassMutual claimed it could deduct $118,975,383 from its 1995 taxes, after it determined in late 1995 that its guaranteed dividend for 1996 would be $185 million. To arrive at this figure, MassMutual first calculated the dividends it expected to pay the class of eligible policyholders, multiplied this amount by 85% to account for the possibility that some policies might lapse, and then determined how much of this figure, i.e., the guaranteed dividend, would be paid by September 15, 1996. Thus, although the guaranteed dividend for 1996, was $185 million, MassMutual only deducted $118,975,383 from its 1995 taxes, instead of waiting to deduct the entire guaranteed dividend from its 1996 taxes.

For each disputed year, MassMutual disclosed to the relevant state regulators that it would pay guaranteed

amounts to a class of participating policyholders, and each year the regulators had no objections. MassMutual did not, however, actually disclose the amount of the guarantees to the state insurance regulators and did not disclose the guarantee to its policyholders or its sales force. For its guarantee in 1995, ConnMutual did disclose the guaranteed dividend in a footnote in its annual statement, but ConnMutual did not disclose the terms of the guarantee or that it would apply only to post-1983 policies. Like MassMutual, ConnMutual also disclosed to the state regulators that it would pay the guarantees and the regulators did not object. For each of the disputed years, the actual payment of dividends exceeded the guaranteed dividend by several million dollars—in 1996, the actual payment for both MassMutual and ConnMutual exceeded the guaranteed amount by $37.8 million; in 1997, the actual payment exceeded the guaranteed amount by $44.7 million; and in 1998, the actual payment exceeded the guaranteed amount by $55.1 million.

## B. Court of Federal Claims Proceedings

In September 2007, MassMutual filed an action in the Court of Federal Claims on behalf of itself and ConnMutual to recover funds allegedly overpaid to the IRS for the 1995, 1996, and 1997 tax years. The dispute over the deductions arose after an IRS audit, in connection with which the IRS proposed adjustments to MassMutual's tax returns for 1995, 1996, and 1997 and ConnMutual's 1995 tax return, in part, because it found that MassMutual and ConnMutual could not deduct any portion of the guaranteed dividends in the year before the dividends were paid. These adjustments resulted in an alleged underpayment of taxes for the relevant years. To correct the deficiencies, MassMutual made the necessary payments under protest, and subsequently filed a claim with the IRS for a refund for both it and ConnMutual. At the time of its complaint, the IRS had yet to take action on MassMutual's claim and had partially disallowed a refund to ConnMutual.

During the proceedings, the parties did not dispute whether MassMutual could deduct the payments, only *when* any of the guaranteed dividends could be deducted. Generally, the government believed that MassMutual could not deduct dividends in the year the guaranteed dividend was calculated, but instead, had to wait until the next year, when the guaranteed dividend was actually paid, because MassMutual had not satisfied the "all events" test for the liability. The parties agreed that the timing question could be resolved if the following two issues were addressed: (1) whether, in the years they were adopted, the resolutions to pay the guaranteed dividend fixed MassMutual's liability to pay the declared guaranteed minimum amounts in the following year; and (2) whether MassMutual's policyholder dividends are rebates, refunds, or similar payments under 26 C.F.R. § 1.461-4(g)(3), which qualify for the recurring item exception under 26 C.F.R. § 1.461-5(b)(5)(ii).

A trial was held in December 2009, and following extensive post-trial briefing, the Court of Federal Claims issued its decision in January 2012, finding in favor of MassMutual.

With respect to the first issue, the government initially disputed the existence of an actual obligation to pay the dividend. It argued that the guarantees were revocable because the guarantees were not disclosed to the policyholders and were unlikely to be enforced by a regulator. *Mass. Mut. Life Ins. Co.*, 103 Fed. Cl. at 138. Even if such a liability existed, the government argued that it was not fixed, because it was contingent upon at least one policy being in force on its anniversary date, which could only be determined in the year when the dividend was paid.

In dismissing the government's arguments, the Court of Federal Claims explained that there was no apparent requirement that a policyholder be aware of the dividend in order for a company to deduct the expense. *Id*. Fur-

ther, there was nothing to suggest that an expense must be irrevocable to accrue as a liability. *Id*. at 139. Additionally, in this case, MassMutual had informed state regulators of these dividends, the state regulators approved the dividends, and there was evidence that the regulators had authority to enforce the dividend guarantees if that were necessary. Even if state regulators could not have enforced the dividend guarantees, the Court of Federal Claims found that this did not prevent MassMutual from establishing the fact of liability because a liability need not be legally enforceable to be fixed under the "all events" test. *Id*. at 140.

As to whether the dividends were contingent upon an event that must occur before the duty to pay a dividend arises, the Court of Federal Claims found that there was a group of policyholders who were already eligible to receive dividends in each year during which the guaranteed dividends were determined, because these individuals had paid their premiums through the next anniversary. *Id*. at 135. Because only the passage of time stood between the guarantees and the receipt of a dividend by these individuals, the liability was fixed at the time the guaranteed dividends were approved by the board of directors. While the government alleged that this finding was not dispositive because MassMutual's typical practice was to pay a dividend only if the policyholders had paid premiums for the two previous policy years, the court found this argument to be unsupported by the evidence. Because it was clear from the record that the lapse rates for policies were low, the Court of Federal Claims determined that it was unlikely the one year policies relied upon would have lapsed and thus been ineligible for dividends. *Id*. at 135–36.

Furthermore, the Court of Federal Claims noted that there was also a small group of existing policies where the premiums were no longer due—so called paid-up policies. *Id*. at 136. These paid-up policies were *certain* to receive

a dividend, because there was no risk that these policies would lapse as the policyholders never had to pay another premium on their policies. Thus, MassMutual was already obligated to pay these policyholders. Accordingly, the Court of Federal Claims concluded that the liability was fixed.

With respect to the second question, the parties agreed that rebates and refunds satisfy the matching requirement, but disputed whether MassMutual's guaranteed dividends qualified as rebates or refunds. Because there was no general definition for the term rebate or refund in the Tax Code or the applicable Treasury Regulations, the Court of Federal Claims considered the ordinary meaning of the terms, industry usage, dictionary definitions, and testimony presented at trial, in order to determine if the disputed guarantees were rebates or refunds. *Id*. at 155–166. In light of this evidence, it concluded that the dividends were a return of premiums paid by the policyholders, and, thus, should be treated as rebates or refunds. *Id*. at 166. Accordingly, the Court of Federal Claims held that MassMutual's deductions qualified under the recurring item exception, because its dividends satisfied the matching requirement.

Lastly, the government alleged that the guarantees lacked economic substance because there was no non-tax business purpose for setting them. The Court of Federal Claims rejected this contention, explaining that the purpose of the economic substance doctrine is to prevent taxpayers from taking improper deductions, which was not the case here. *Id*. at 170. Because the dispute was only with respect to the *timing* of the deduction, the Court of Federal Claims concluded that the typical economic substance analysis was inapplicable in this case, and that there was no other reason to preclude MassMutual from deducting the guaranteed dividends in the years in which they were calculated. *Id*. at 173.

Because MassMutual's deductions were fixed in the year the dividends were determined and the guaranteed dividends were rebates, the Court of Federal Claims concluded that MassMutual was entitled to a refund for its and ConnMutual's overpayment of taxes in 1995, 1996, and 1997. *Id.* at 173–74.

The government timely appealed this decision. The court has jurisdiction to review the Court of Federal Claims' final judgment under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

Whether a taxpayer has satisfied the "all events" test is a question of law that we review de novo. *See In re Harvard Indus., Inc.*, 568 F.3d 444, 450 (3d Cir. 2009); *United States v. O'Cheskey*, 310 F. App'x 726, 734 (5th Cir. 2009); *Interex, Inc. v. Comm'r*, 321 F.3d 55, 58 (1st Cir. 2003); *Gold Coast Hotel & Casino v. United States*, 158 F.3d 484, 487 (9th Cir. 1998). The interpretation of a regulation is also a question of law that is reviewed de novo. *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 836 (Fed. Cir. 2006); *see also Am. Express Co. v. United States*, 262 F.3d 1376, 1382–83 (Fed. Cir. 2001). Any fact finding by the Court of Federal Claims is sustained unless it is clearly erroneous. *AT&T Co. v. United States*, 307 F.3d 1374, 1377 (Fed. Cir. 2002). "A finding is 'clearly errone-ous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

On appeal, the government again challenges the tim-ing of the deductions, claiming that the guaranteed divi-dends were not fixed in the year that the dividends were set by the board, and that these payments were not rebates. It does not contest the Court of Federal Claims' ruling regarding the economic substance of the deduction.

A. Existence of Obligations

As an initial matter, the government again contests whether the dividend guarantees give rise to true obligations that can be deducted. If there is no obligation, it is irrelevant whether such an obligation is fixed.

The government alleges that MassMutual's disclosures to state regulators do not change the reality that these promises were revocable, because MassMutual never informed the policyholders of these dividends. To support its position, the government relies on *New York Life Insurance Co. v. United States*, which also addressed the timing of participating policyholder dividend deductions. 724 F.3d 256 (2d Cir. 2013).

There, New York Life Insurance Company ("New York Life") argued that it could deduct two types of dividends, annual dividends and minimum liability dividends, both of which it considered accrued in the tax year before the dividends were actually paid. *Id.* at 257. Regarding the annual dividends, New York Life's practice was to credit an individual policyholder's account before, but no more than thirty days before, the policy's anniversary date. *Id.* at 259. This credit would be generated if a "policyholder had paid all the premiums necessary to keep the policy in force through its anniversary date. New York Life did not actually *pay* the dividend, however, until the 'the Credited Policy's anniversary date.'" *Id.* Because the credit date for January policies fell within the prior year, New York Life deducted these credits in the year before the dividend was paid.

New York Life's minimum liability dividend arose from its decision to also offer termination dividends, which are dividends paid to a policyholder when he or she ends a policy. New York Life understood that it could hypothetically pay an annual dividend, a termination dividend, or both an annual dividend and a termination dividend, to an individual policyholder in one year. New

York Life then calculated the annual dividends and termination dividends that it anticipated it would pay in the following year. Surmising that it would pay at least the lesser of the annual or termination dividend to eligible policyholders, New York Life deducted the lesser amount in the tax year before any dividend was paid.

Upon review, the Second Circuit disagreed with New York Life's practices, finding that such deductions were improper because they failed to meet the "all events" test. For the annual dividends, the Second Circuit determined that the obligation to pay the annual dividends depended upon the individual policyholder retaining his or her policy through the policy's anniversary date. *Id.* at 263. Because the decision to maintain the policy through the anniversary date would not occur before the close of the prior tax year, New York Life's obligation to pay the annual dividend could not accrue when the individual policyholder accounts were credited the year before. Additionally, the Second Circuit concluded that there was no basis for New York Life's minimum liability dividend deduction, because New York Life was under no obligation to pay the termination dividend when a policyholder ended his or her policy. *Id.* at 266. Without an actual requirement to pay these dividends, the Second Circuit concluded it was irrelevant that New York Life's board of directors passed an "irrevocable" board resolution approving such a payment, since "a board's resolution cannot convert a voluntary expense into an accrued liability for federal income tax purposes." *Id.* at 267. Accordingly, the Second Circuit concluded New York Life's deductions were improper.

The government's argument is largely premised on the idea that MassMutual had no obligation to pay its eligible policyholders a dividend, absent its board of directors' resolution to pay a dividend, which was the case in *New York Life* with respect to the termination dividends. Unlike *New York Life*, however, the policies at

issue here stated that MassMutual and ConnMutual would pay dividends to eligible policyholders. *Mass. Mutual Life Ins. Co.*, 103 Fed. Cl. at 114 ("A sample MassMutual participating policy, included as a Joint Exhibit, stated: 'Each year we determine how much money can be paid as dividends. This is called divisible surplus. We then determine how much of this divisible surplus is to be allocated to this [participating] policy.'"); *see also* Joint Appendix 139 ("While this [ConnMutual] Policy is in force, except as extended term insurance, we will credit it with dividends. Dividends are based on such shares of the divisible surplus (if any) as we may apportion at the end of each Policy Year."). While MassMutual and ConnMutual ultimately would determine the portion of the guarantee eligible policyholders would receive based on the size of the surplus and the number of policyholders who were eligible for the payments, policyholders had a contractual expectation nonetheless that they would receive a policyholder dividend. For these reasons, we find the government's assertion that *New York Life* forecloses a finding that the disputed guarantees are actual obligations unpersuasive.

The government also alleges that MassMutual's disclosure of the dividend guarantees to state regulators was merely an empty gesture. Because some dividend was virtually guaranteed each year, it contends that the disclosure to the regulators of a guaranteed dividend was meaningless. The government neglects to discuss the evidence on the record that the state regulators did have the authority to enforce MassMutual's guarantees. Absent an argument that this finding was clear error, the court will not disturb the Court of Federal Claims' determination that the government's enforceability concerns did not prevent the guaranteed dividends from being fixed in the year in which MassMutual calculated the guaranteed dividends.

## B. Fixation of Liability

The government also argues that MassMutual can only deduct the guaranteed dividend in the tax year in which the dividends were paid and cannot deduct them in the year the guaranteed dividend was determined, because a condition precedent to the payment guarantee—i.e., that the policies remain in force as of the anniversary date—may not be satisfied. It correctly explains that the "all events" test, in part, requires that a liability first be firmly established, because one cannot deduct a liability that is contingent or contested. *See Gen. Dynamics*, 481 U.S. at 243–44 ("Nor may a taxpayer deduct an estimate of an anticipated expense, no matter how statistically certain, if it is based on events that have not occurred by the close of the taxable year."); *United States v. Hughes Properties, Inc.*, 476 U.S. 593, 600 (1986) ("[T]he Court's cases have emphasized that 'a liability does not accrue as long as it remains contingent.'") (quoting *Brown v. Helvering*, 291 U.S. 193, 200 (1934)). The government's assertion that MassMutual's obligation to pay the guaranteed dividends is contingent on an event that cannot be determined until the year the dividends are paid is factually incorrect, however.

The government's argument concerns the requirement that a policy still be in force before a dividend is paid to a policyholder. Because it is unknown whether a policyholder will surrender his or her policy before its anniversary date, the government contends that the obligation to pay the dividend is contingent upon an event that would not occur until the next year, and is therefore not fixed. Again, the government cites heavily to *New York Life* to bolster its contention. The government's reliance on *New York Life* is misplaced.

While the present case is similar to *New York Life* in the sense that both cases involve policyholder dividend deductions, the facts of this case dictate a different out-

come than the one reached in *New York Life*. In guaranteeing a certain amount of dividends each year for its policyholders, MassMutual promised an entire class of policyholders that they would be entitled to the guaranteed payments on a pro rata basis. On the other hand, New York Life made such guarantees on an individual basis. *See New York Life*, 724 F.3d at 259 (explaining that the company's practice was to credit an individual policyholder's account with the dividend before the policy's anniversary date and deduct these credits from its gross income, before the dividends were actually paid to policyholders in the following year). While the government attempts to equate the two fact patterns, the difference between the two is significant.

Only in one instance will an individual policyholder's choice to end the insurance policy early affect the company's obligation to pay the dividend—the case presented in *New York Life*. Because MassMutual guaranteed the dividend to a class of policyholders, an individual's decision to terminate his or her policy does not affect MassMutual's obligation to pay a dividend to the remaining members of the class of policyholders. Rather, it affects only *how much* MassMutual would pay the remaining members of the class. So long as there is at least one member of the class remaining, the guaranteed dividend would be paid. At the end of each disputed taxable year, there were thousands of paid-up post-1983 policies with no risk of lapse, thus MassMutual was obligated to pay at least this group of policyholders. And by its declaration to pay a guaranteed dividend to the class of eligible policyholders, MassMutual was obligated to pay at least this group the guaranteed amount.

While the composition of the class could change throughout the year, this does not change the outcome of this case, because not knowing the ultimate recipient of the payment does not prevent a liability from becoming fixed. *Hughes Properties*, 476 U.S. at 601; *Wash. Post Co.*

*v. United States*, 405 F.2d 1279, 1284 (Ct. Cl. 1969) (explaining that "when a 'group liability' is involved, it is the certainty of the liability which is of utmost importance . . . and not necessarily . . . the identity of the payees."). So long as an obligation is not subject to some event that must occur for a liability to become due, then the liability is considered fixed. *Gen. Dynamics*, 481 U.S. at 244. In this case, the only uncertainty at the end of the year in which the guarantees were determined was *who* would ultimately make up the group of policyholders—there was no question that MassMutual had passed an absolute resolution to pay the guaranteed dividend and that at least some policyholders were already qualified recipients of that guarantee. Accordingly, the liability to pay the guaranteed dividend became fixed in the year in which the board of directors adopted the guaranteed dividend resolutions and at least some number of policyholders had paid-up premiums for their policies, facts which the Court of Federal Claims determined existed for each of the tax years in question.

## C. Definition of Rebate

The government also argues that the Court of Federal Claims erred in finding that MassMutual's guaranteed dividends were rebates. Specifically, the government alleges that the IRS's interpretation that these types of payments are not rebates is controlling and should be given deference. Even without deference, the government alleges that the IRS's interpretation of Treasury Regulation § 1.461-4(g)(3) should prevail in light of the surrounding language of the regulation, and the legislative and regulatory history.

When construing a regulation, the court applies the same interpretative rules it uses when analyzing the language of a statute. *See Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005) ("We construe a regulation in the same manner as we construe a stat-

ute . . . .”).  Accordingly, it is appropriate to first consider the “plain language [of the regulation] and consider the terms in accordance with their common meaning.” *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997).  In doing so, the court considers “the text of the regulation as a whole, reconciling the section in question with sections related to it.” *Lengerich v. Dep’t of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006) (citing *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577–78 (Fed. Cir. 1995)).  If the regulatory language is clear and unambiguous, then no further inquiry is usually required.  *Roberto v. Dep’t of the Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006).

If the language is ambiguous, then the court must typically defer to the agency’s interpretation of the regulation.  *Auer v. Robbins*, 519 U.S. 452, 461–62 (1997); *Gose*, 451 F.3d at 836 (“As a general rule, we must defer to an agency’s interpretations of the regulations it promulgates, as long as the regulation is ambiguous and the agency’s interpretation is neither plainly erroneous nor inconsistent with the regulation.”) (citing *Gonzales v. Oregon*, 126 S. Ct. 904, 914 (2006) (“An administrative rule may receive substantial deference if it interprets the issuing agency’s own ambiguous regulation.”)); *see also Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) (“In *Auer*, we held that an agency’s interpretation of its own regulation is entitled to deference. But *Auer* deference is warranted only when the language of the regulation is ambiguous.”) (citations omitted).  Deference can even be afforded to an agency’s interpretation when that interpretation is advanced in a legal brief.  *See Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 881 (2011) (explaining that the deference granted in *Auer* was to an agency’s interpretation that was presented in an *amicus* brief submitted by the agency at the Supreme Court’s invitation).

But such deference is not always afforded to an agency’s interpretation of its own regulation.  “Deference is undoubtedly inappropriate, for example, when the agen-

cy's interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (quoting *Auer*, 591 U.S. at 461). It is also unwarranted when there is "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, 519 U.S. at 462. Such a reason exists "when the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position, or a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack." *Christopher*, 132 S. Ct. at 2166–67 (quotations and citations omitted).

### 1. Interpretation of "Rebates, Refunds, and Similar Payments"

When deciding how to construe the terms "rebate, refund, and similar payments" in Treasury Regulation § 1.461-4(g)(3), the Court of Federal Claims determined that there was no general definition for the term rebate or refund in the Treasury Regulations; rather, the only definitions in the regulations for rebates and refunds were for very specific contexts, not at issue in this case. Because "neither the Tax Code nor the Treasury Regulations provide a specific definition for rebate or refund applicable to this case," the Court of Federal Claims decided to apply basic statutory interpretation principles, including reliance on dictionary definitions, to determine the correct interpretation of refunds and rebates in the context of Treasury Regulation § 1.461-4(g)(3). *Mass Mut. Life Ins. Co.*, 103 Fed. Cl. at 155. It ultimately concluded that MassMutual's policyholder dividend payments qualified as rebates, refunds, or similar payments. *Id.* at 166.

As previously discussed, the matching requirement of Treasury Regulation § 1.461-5(b)(5)(ii) can be satisfied by rebates or refunds as described in Treasury Regulation § 1.461-4(g)(3), which states:

(3) *Rebates and refunds.* If the liability of a tax-payer is to pay a rebate, refund, or similar payment to another person (whether paid in property, money, or as a reduction in the price of goods or services to be provided in the future by the tax-payer), economic performance occurs as payment is made to the person to which the liability is owed. This paragraph (g)(3) applies to all rebates, refunds, and payments or transfers in the nature of a rebate or refund regardless of whether they are characterized as a deduction from gross in-come, an adjustment to gross receipts or total sales, or an adjustment or addition to cost of goods sold. In the case of a rebate or refund made as a reduction in the price of goods or services to be provided in the future by the taxpayer, "payment" is deemed to occur as the taxpayer would other-wise be required to recognize income resulting from a disposition at an unreduced price. See *Example 2* of paragraph (g)(8) of this section. For purposes of determining whether the recurring item exception of § 1.461-5 applies, a liability that arises out of a tort, breach of contract, or violation of law is not considered a rebate or refund.

26 C.F.R. § 1.461-4(g)(3).

The Treasury Regulations provide no applicable defi-nition for the terms "rebate, refund, or similar payment." When terms are undefined, the court may consider the definitions of those terms in order to determine their meaning. *See Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011) ("Dictionary definitions can elucidate the ordinary meaning of statutory terms."); *Am. Express Co.*, 262 F.3d at 1381 n.5 ("It is appropriate to consult dictionaries to discern the ordinary meaning of a term not explicitly defined by statute or regulation.").

At the time the disputed regulation was adopted in 1992, Black's Law Dictionary defined the term "rebate" as a "[d]iscount; deduction or refund of money in consideration of prompt payment.  A deduction from a stipulated premium on a policy of insurance, in pursuance of an antecedent contract.  A deduction or drawback from a stipulated payment, charge, or rate . . . not taken out in advance of payment, but handed back to the payer after he has paid the full stipulated sum . . . ."  BLACK'S LAW DICTIONARY 1266 (6th ed. 1990).  It also defined "refund" as "[t]o repay or restore; to return money in restitution or repayment; *e.g.* to refund overpaid taxes; to refund purchase prices of returned goods."  *Id*. at 1281.

Reviewing these definitions, it is clear that the term rebate encompasses a return of a portion of the original life insurance premium to a policyholder in the form of a policyholder dividend, also known as a premium adjustment.  The IRS Code itself supports such an interpretation, by defining "premium adjustment" in the context of insurance as "any reduction in the premium under an insurance or annuity contract which (but for the reduction) would have been required to be paid under the contract."  26 U.S.C. § 808(d).  Additionally, this construction comports with this court's own understanding of policyholder dividends.  *See John Hancock Servs., Inc. v. United States*, 378 F.3d 1302, 1303 (Fed. Cir. 2004) ("Policyholder dividends are price rebates that the company can deduct from its taxable earnings."); *Principal Mut. Life Ins. Co. v. United States*, 295 F.3d 1241, 1242 (Fed. Cir. 2002) ("Mutual life insurance companies give premium rebates to their policyholders."); *CUNA Mut. Life Ins. Co. v. United States*, 169 F.3d 737, 738 (Fed. Cir. 1999) ("Life insurance companies traditionally rebate to their policy holders, as excessive charges, part of the premiums paid and deduct these payments from their income.").

The government argues, nevertheless, that the surrounding language in § 1.461-4(g) and in the related

Treasury Regulation § 1.461-4, which describes the recurring item exception, do not support this interpretation. *Reflectone*, 60 F.3d at 1577–78 (citing *Beecham v. United States*, 511 U.S. 368, 372 (1994) ("The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences.")).  For example, the government cites to language in § 1.461-4(g) that explains a rebate or refund can be "an adjustment to gross receipts or total sales," "an adjustment or addition to cost of goods sold," or "a reduction in the price of goods or service to be provided in the future by the taxpayer."  It contends that such language is inapplicable in this case.  But contrary to the government's argument, this language actually supports the conclusion that a premium adjustment—an adjustment to the initial cost of insurance—is a rebate.

The government also cites to § 1.461-4(g)(5), which discusses insurance, warranty, and service contracts, to support its conclusion that policyholder dividends are not rebates.  Treasury Regulation § 1.461-4(g)(5) states that "[i]f the liability of a taxpayer arises out of the provision to the taxpayer of insurance, or a warranty or service contract, economic performance occurs as payment is made to the person to which the liability is owed."  Because this section refers explicitly to insurance, the government contends that, if refunds and rebates were to cover policyholder dividends, there would likewise be a specific reference to such dividends in § 1.461-4(g)(3).  What the government neglects to mention is that there are *no* specific references made to the types of refunds included in § 1.461-4(g)(3); the failure to include a particular reference to policyholder dividends, thus, is not surprising.  There is nothing in the regulations the government references that conflicts with the construction of rebate adopted by the Court of Federal Claims.

Additionally, the government asserts that its interpretation is supported by both legislative and regulatory history, because there was no mention of policyholder

dividends as rebates in either the discussion of the statute which statutorily established the economic performance requirement, the Deficit Reduction Act of 1984, or the IRS regulations related to that act. While the government is correct that policyholder dividends are not referenced in the House Conference Report on the Deficit Reduction Act of 1984 or by the IRS, only one type of rebate or refund is ever referenced with specificity—utility refunds, which are given to natural gas utilities when they have been overcharged by their suppliers. *See* H.R. Conf. Rep. No. 98-861, at 876 (1984) (discussing that with the changes to 26 U.S.C. 461(h) requiring economic performance, commentators argued that the statute should be interpreted to allow "a utility [to] deduct [natural gas supplier] refunds in the year the refund was included in the income of the utility, provided that the refunds are passed through to consumers within a reasonable period of time in the following taxable year"); 57 Fed. Reg. 12411, 12416, T.D. 8408 (Apr. 9, 1992) (noting that "the final regulations [relating to the economic performance requirement did] not provide any special rules for natural gas suppliers or other public utilities"). The discussion of one very specific type of refund does not create an inference that policyholder dividends in the form of premium adjustments should not be considered "rebates, refunds, or similar payments," especially when adopting such a construction would conflict with the plain and ordinary meaning of the contested terms.

Here, the plain and ordinary meaning of the terms rebate and refund include premium adjustments distributed to policyholders in the form of dividends. While the government also complains that the Court of Federal Claims' analysis is flawed for giving undue weight to industry usage, and ignoring the actual nature of policyholder dividends, which could be also seen as a return of equity and not merely a price rebate, on the record before us, we find these arguments unpersuasive. The Court of

Federal Claims thoroughly considered these questions and we see no error in the manner in which it did so. The government's final argument is that the IRS's interpretation of the regulation should be afforded deference. Because the terms are unambiguous, the court need not consider whether it should defer to the IRS's interpretation of the regulation. Even if we were to conclude that the regulation is ambiguous, moreover, for the reasons explained below, we decline to afford deference to the IRS's interpretation in this case.

### 2. Deference to the IRS's interpretation of § 1.461-4(g)(3)

The court first notes that the government did not present a deference argument to the Court of Federal Claims. As a general principle, appellate courts do not consider issues that were not clearly raised in the proceeding below. *Hormel v. Helvering*, 312 U.S. 552, 556 (1941); *see San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1354–55 (Fed. Cir. 2011) ("Because the [litigant] did not raise this argument before the Court of Federal Claims, it is waived on appeal."). "Only rarely will an appellate court entertain" a novel argument raised for the first time on appeal. *Karuck Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1379 (Fed. Cir. 2000); *see Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.").

While the government argues that the doctrine of waiver is inapplicable here because the Court of Federal Claims raised the deference issue *sua sponte* in its opinion, the government mischaracterizes the court's discussion of deference. In considering how to define rebates and refunds, the Court of Federal Claims first considered whether 26 U.S.C. § 461(h)(3), the statute which discusses the recurring item exception, explained what type of

transactions met the exception. In finding it did not, the Court of Federal Claims next considered if Treasury Regulation § 1.461-5, which address the matching requirement of §461(h)(3), was a reasonable and consistent interpretation of the statute. If the regulation was consistent with the aim of the statute, then the court could rely upon it in determining if policyholder dividends satisfied the matching requirement. *Mass Mut. Ins. Co.*, 103 Fed. Cl. at 151 ("Treasury regulations are entitled to great deference, and must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." (quoting *CUNA Mut. Life Ins. Co.*, 169 F.3d at 742)). The Court of Federal Claims never discussed whether the IRS's *interpretation* of Treasury Regulation § 1.461-4(g)(3) was entitled to deference; it only considered whether the IRS's statutory interpretation was reasonable. Accordingly, the court will not excuse the government's failure to raise the *Auer* deference argument below.

Assuming arguendo that the government did not waive its deference argument, deference would not be warranted here. The government asserts that the IRS's interpretation of Treasury Regulation § 1.461-4(g)(3) to exclude policyholder dividends as rebates or refunds—which was advanced for the first time in this litigation—should be afforded deference. It cites to two IRS Field Service Advisories to support its contentions that the IRS has considered the question carefully, and that its ultimate interpretation "reflect[s] the agency's fair and considered judgment on the matter in question," and was not merely created for litigation purposes. *Auer*, 519 U.S. at 462.

The two IRS Field Service Advisories cited by the government do not take any position as to how policyholder dividend liabilities should be classified, however. *See* IRS Field Service Advisory, 1994 WL 1865978 (Apr. 28, 1994) ("Given that, in theory, policyholder dividends may represent in part a return on equity and in part a price ad-

justment, we believe that the policyholder dividend liabilities at issue are appropriately classified as § 1.461-4(g)(7) 'other liabilities,' § 1.461-4(g)(3) 'rebates and refunds,' or some combination of the two."); IRS Field Service Advisory, 1998 WL 1984267 (Aug. 24, 1998) ("Although we believe it is possible to characterize the liability to pay policyholder dividends either as a rebate or as an 'other' liability, we characterize the liability as a rebate for purposes of this advice."). "While agency positions articulated in litigation briefs may be entitled to deference, such deference is earned *only* if the brief represents the agency's considered position and not merely the views of litigating counsel." *Abbott Labs. v. United States*, 573 F.3d 1327, 1333 (Fed. Cir. 2009) (emphasis added).

In this case, there is no evidence that the IRS's present interpretation reflects such contemplation. *Am. Signature, Inc. v. United States*, 598 F.3d 816, 827 (Fed. Cir. 2010) ("Where the agency's interpretation seeks to advance its litigating position, deference is typically not afforded to the agency's position announced in a brief. But, where the agency is not advancing its litigating position, deference may be afforded [to] an agency's position articulated in its brief.") (citation omitted); *compare Adair v. United States*, 497 F.3d 1244, 1252 (Fed. Cir. 2007) (declining to afford deference to OPM's regulatory interpretation in part because there was no indication that the opinion had been circulated through OPM), *and Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) ("[W]e have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question . . . ."), *with Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 163–64, 171 (2007) (explaining there was no reason to suspect the agency's interpretation did not reflect its fair and considered judgment because it had considered revising its interpretation at least three times over the course of 15 years but had declined to make a change).

Without any other evidence that the IRS had thoughtfully considered its position, "[t]o defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" *Christopher*, 132 S. Ct. at 2167 (quoting *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.)). Accordingly, if the court had found the regulatory language ambiguous, the IRS's interpretation of § 1.461-4(g)(3) to exclude policyholder dividends still would not have been entitled to deference.

### D. MassMutual's Dividends

The last remaining question is whether MassMutual's disputed dividends were premium adjustments and not a distribution of profits. *See* 26 U.S.C. § 808(b) ("[T]he term 'policyholder dividend' includes—(1) any amount paid or credited . . . where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management, (2) excess interest, (3) premium adjustments, and (4) experience-rated refunds.") In concluding that MassMutual's policyholder dividends qualified as a refund or rebate, the Court of Federal Claims cited evidence that the company itself considered these dividends as a return of a portion of the premium and the fact that none of MassMutual's policyholder dividend deductions were treated as a return of equity by the IRS under 26 U.S.C. § 809.[4] In the absence of any evidence that the dividends in question were in fact a return of equity, there is no reason to disturb the Court of

---

[4] This section of the Tax Code, since repealed by the Pension Funding Equity Act of 2004, established a statutory scheme "for calculating the portion of the policyholder dividends that a mutual company could deduct." *John Hancock Servs.*, 378 F.3d at 1303.

Federal Claims' factual finding that these dividends were "in the nature of the price rebates." *Mass Mut. Life Ins. Co.*, 103 Fed. Cl. at 163.

## CONCLUSION

Accordingly, we affirm the Court of Federal Claims' finding that MassMutual's claimed deductions relating to its guaranteed dividends for the 1995, 1996, and 1997 tax years, and ConnMutual's claimed deduction relating to its guaranteed dividend for the 1995 tax year, are allowable.

**AFFIRMED**