*676 HARDIMAN, Circuit Judge,
dissenting.
The Court reverses 'the Tax Court’s order after finding that, at the close of the 2006 and 2007 taxable years for which Giant Eagle deducted anticipated fuel-perks! expenses, “all events ha[d] occurred which determine[d] the fact” that it was liable to pay those expenses. 26 U.S.C. § 461(h)(4). Because I believe Giant Eagle’s liabilities were not determined until fuelperks! were redeemed, I respectfully dissent.
I
The law applicable to this case is relatively clear. An accrual method taxpayer need not ascertain the amount of a liability,[1] to whom it is owed,[2] or when it will be paid[3] in order for events to “determine the fact” of the liability and render it deductible. Instead, all that is required is that it became “fixed and absolute” in the taxable year for which the deduction is sought.[4] United States v. Hughes Props., Inc., 476 U.S. 593, 600, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986) (quotation omitted); see also, e.g., Gold Coast Hotel & Casino v. United States, 158 F.3d 484, 489 (9th Cir.1998) (“[F]or purposes of the ‘all events’ test, what is critical is the existence of an absolute liability....” (emphasis removed)).
Several cases explain what it means for a liability to be fixed and absolute. In United States v. Hughes Properties, Inc., a casino established the fact of its liability to make an additional slot machine payout by raising its progressive jackpot under a Nevada law that prescribed “a fixed liability for the jackpot which it could not escape.” 476 U.S. at 602,106 S.Ct. 2092. In Massachusetts Mutual Life Insurance Co. v. United States, an insurance company determined the fact of its liability to make dividend payments to a class of policyholders after the board of directors “passed an absolute resolution to pay the guaranteed dividend and ... at least some policyholders were already qualified recipients of that guarantee.” 782 F.3d 1354, 1365 (Fed.Cir.2015). And in Lukens Steel Co. v. Commissioner of Internal Revenue, a steel company established the fact of its liability to transfer funds from a contingent liability account to its employees by paying into the account under a collective bargaining agreement that obligated funds “to be used to pay benefits to [the company’s] eligible employees” and specified that “[i]n no event could the [account] be cancelled by” the company. 442 F.2d 1131, 1134-35 (3d Cir.1971). In each of these cases, events took place under a set of rules— imposed by law or contract — that established that the taxpayer was liable and would remain liable until payment was made.
In an effort to identify rules that established Giant Eagle’s liability, the Majority turns to Pennsylvania’s common law of contracts and the terms and conditions of the fuelperks! program. Specifically, it applies the Pennsylvania Superior Court’s decision in Cobaugh v. Klick-Lewis, Inc. to show that Giant Eagle entered into a uni *677 lateral contract with each shopper at checkout, thereby incurring liability to provide discounted gas at that time. 385 Pa.Super. 587, 561 A.2d 1248 (1989). The Majority notes that accrued fuelperks! were not expressly permitted to be, and never have been, retracted by Giant Eagle. Based on these observations, the Majority concludes that “Giant Eagle amply demonstrated the existence — as of year’s end — of both an absolute liability and a near— certainty that the liability would soon bé discharged by payment.” Maj. Typescript at 675. While I agree with the Majority’s observations, I disagree with its conclusions.
We have elsewhere applied Cobaugh for the proposition that an advertisement promising an opportunity to earn a benefit in exchange for performance can give rise to a unilateral contract. Pacitti v. Macy’s, 193 F.3d 766, 772-73 (3d Cir.1999) (applying Cobaugh to an offer for “the opportunity of becoming ‘Broadway’s New “Annie” ’ ”). Accordingly, I am constrained by precedent to agree with my colleagues that, under Cobaugh, Giant Eagle’s advertisements constituted an offer to its shoppers to enter into a unilateral contract for the opportunity to redeem fuelperks! for discounted gas by purchasing $50 or more in groceries. See Hughes Props., 476 U.S. at 601-02, 106 S.Ct. 2092 (applying state law to determine whether a casino’s liability was fixed). Qualifying.purchases met the complete performance requirement and “[liability therefore attached upon ... performance, i.e., at checkout.” Maj. Typescript at 675.
Nonetheless, the liabilities that accrued to Giant Eagle on account of its fuelperks! program were not absolute. The casino in Hughes Properties, the insurance company in Massachusetts Mutual, and the steel company in Lukens Steel all operated under a set of rules that offered no hope of escape from their fixed liabilities. In each case, those liabilities had to remain on their books until discharged by payment. Here, in contrast, Giant Eagle made each liability temporary by providing that “fuel-perks! discounts expire 3 months after the last day of the month in which they’re earned.” App. 1161. If a shopper failed to redeem fuelperks! within that time-frame, the discounts were lost and Giant Eagle had no obligation to honor a belated attempt at redemption. After acknowledging this fact, the Majority offers reasons why we should nonetheless conclude that Giant Eagle faced “an absolute liability.” Maj. Typescript at 675. After careful consideration of those reasons, I remain unconvinced.
First, the Majority emphasizes that “none of the published program parameters suggested that Giant Eagle reserved the right to retract rewards that customers had already accrued” and “[n]o such retroactive termination ever occurred, or was even contemplated.” Id. at 14-15 (quotation omitted). While these statements are undoubtedly true, they do not change the fact that the company’s liabilities were extinguishable by another means. Like retraction, expiration has the effect of ■eliminating liability for the benefit of Giant Eagle.
Second, the Majority notes that “it is irrelevant that neither the total amount of Giant Eagle’s anticipated liability nor the identity of all the customers who eventually applied discounts toward gasoline purchases could be conclusively identified by year’s end.” Id. at 15 (emphasis removed). In my view, this comment reveals an analytical error, ie., a conversion of Giant Eagle’s individual liabilities into a group liability. In order to establish that Giant Eagle faced a fixed liability, the Majority applies Cobaugh to conclude that the company entered into a unilateral contract at checkout with — and therefore be *678 came liable to provide discounted gas to— each shopper. Consequently, its liabilities were several and fixed on an individual basis. But the Majority later departs from that reality by treating the company’s numerous individual liabilities as an amalgamation. See Maj. Typescript at 674-75 (citing Lukens Steel and Massachusetts Mutual, cases that each involved a single group liability); see also id. at 16 (“Giant Eagle amply demonstrated the existence — as of year’s end — of ... an absolute liability” (emphasis added)). This errant tack is critical because whether liability is fixed on an individual or collective basis is a “significant” fact with the potential to “dictate ... different outcome[s]” in our cases. Mass. Mutt., 782 F.3d at 1364. Accordingly, I cannot agree with the Majority’s analysis, which perceives Giant Eagle’s liability as being fixed both on an individual and collective basis.
As I see it, the question for our resolution is whether Giant Eagle’s liability to any individual shopper with accrued-but-not-yet-redeemed fuelperks! was certain to continue under the rules applicable to that liability until it was paid. Because one of those rules allowed for the expiration of each shopper’s fuelperks! (and Giant Eagle’s corresponding liability to that shopper), the answer is plainly “no.” While Giant Eagle became liable to a shopper at checkout, it did not become absolutely liable to that shopper unless and until the shopper redeemed fuelperks! prior to their expiration. For that reason, I would hold that, at the close of the 2006 and 2007 taxable years, Giant Eagle faced many fixed liabilities for yet-to-be-redeemed fu-elperks!, but none that were “determine[d] in fact” because each was contingent upon future redemption by the shopper.
^5 H'
Had Giant Eagle not included an expiration provision in its terms and conditions, I would be inclined to agree with my colleagues that the company incurred a fixed and absolute liability to each shopper at checkout. In that case, we would face the difficult task of determining whether historical redemption data and other evidence reveal more than “an extremely remote and speculative possibility” that any given shopper would fail to timely redeem discounts and how much bearing, if any, the answer to 'that question has on whether the company’s liabilities were “determine[d] in fact.” Hughes Props., 476 U.S. at 601, 106 S.Ct. 2092; see Gold Coast Hotel & Casino, 158 F.3d at 489 (interpreting Hughes Properties to require at least a “reasonable expectancy” that the liability will be discharged by payment of cash or its equivalent). But the fact that the store did include an expiration provision — thereby conditioning its liability to each shopper upon fuelperks! redemption at a Giant Eagle-owned gas station within approximately 3 months’ time — made “redemption” a condition precedent to the establishment of an absolute liability. Because that event had not occurred by the close of the 2006 or 2007 taxable years with respect to the deductions Giant Eagle claimed on accrued-but-not-yet-redeemed fuelperks!, I would hold that the “all events” test was not satisfied and those anticipated expenses were not deductible.
II
In light of my view regarding Giant Eagle’s failure to satisfy the “all events” test, I turn to its alternative argument. Giant Eagle contends that its deductions were the functional equivalent of offsets to income permissible under a longstanding exception to the “all events” test. Pursuant to Treasury Regulation § 1.451-4(a)(1), “[i]f an accrual method taxpayer issues trading stamps or premium coupons with sales” that are redeemable “in merchandise, cash, or other property,” the taxpayer should “subtract from gross re *679 ceipts” the estimated cost of redemption of those stamps and coupons in calculating taxable income.[5] While it is undisputed that fuelperks! are “issue[d] ... with sales” of groceries, the parties contest the exception’s two other requirements: (1) whether fuelperks! qualify as “trading stamps or premium coupons” and (2) whether fuelperks! are redeemable “in merchandise, cash, or other property.” Because fuelperks! are not redeemable “in merchandise, cash, or other property,” I agree with the Tax Court and would hold that § 1.451 — 4(a)(1) does not authorize Giant Eagle’s deductions.
In a 1978 revenue ruling, the IRS interpreted the phrase “in merchandise, cash, or other property” to imply an “unconditional” right of redemption, meaning that in order for a stamp or coupon to fall under § 1.451^1(a)(l) it must be “redeemable without additional consideration from the consumer.” Rev. Rui. 78-212, 1978-1 C.B. 139, *2 (1978). For that reason, the IRS advised a manufacturer that it “may not avail itself of [§ 1.451^1(a)(l) ]” to account for the redemption of “coupons that entitle consumers to a discount on the sales price of certain products purchased in the future.” Id. at *1. Such coupons are not redeemable “in merchandise, cash, or other property” because their redemption is “conditioned on an additional purchase.” Id. at *2.
In response to Revenue Ruling 78-212, Congress added § 466 to the Internal Revenue Code. That section authorized[6] taxpayers to offset revenue with respect to a limited class of discount coupons — ie., those which, inter alia, were redeemable for “a discount on the purchase price of merchandise or other tangible personal property.” Treas. Reg. § 1.466 — 1(c)(1). In other words, in reconciling (1) its interest in the ability of companies to offset the cost of certain discount coupons with (2) the IRS’s interpretation of § 1.451-4(a)(l) which precluded such offsets, Congress chose not to broaden the IRS’s interpretation. Instead, Congress passed a law which independently authorized those offsets and, in doing so, expressly drew a distinction between redemption in property (the nature of redemption that falls within the ambit of § 1.451 — 4(a)(1)) and redemption of a discount on the purchase price of property (the nature of redemption addressed by § 466) — a distinction it has drawn in other areas as well. See Treas. Reg. § 1.461 — 4(g)(3) (explaining that a “rebate, refund, or similar payment” can be paid “in property, money, or as a reduction in the price of goods or services” (emphasis added)).
As advertised, a fuelperks! reward entitled its holder to “lOe off every gallon of gas on your next fill-up at GetGo.” App. 1161. Therefore, the benefits provided by fuelperks! were discounts on the purchase price of gasoline, not an entitlement to gasoline itself or the discount’s cash value. This is true even though fuelperks! could be accumulated and redeemed en masse for free gas. In those situations, shoppers did not exchange fuelperks! for gas as such, but rather for a 100% discount on the *680 price of gas — a functional equivalent to be sure, but reflective of an important distinction respecting the nature of fuelperks! redeemability. It is this nature of redeem-ability — i.e., that fuelperks! can be exchanged only for discounts — that leads me to conclude that fuelperks! were not redeemable “in merchandise, cash, or other property.” Giant Eagle asks us to reject this conclusion for two reasons, neither of which I find persuasive.
First, .Giant Eagle argues that “discounts against gas” count as “other property” within the meaning of § 1.451 — 4(a)(1) and the IRS’s contrary interpretation was “mistakenly viewed as persuasive” by the Tax Court. Giant Eagle Br. 60. I disagree because the notion that the phrase “in merchandise, cash, or other property” categorically excludes coupons redeemable for discounts is supported not only by the persuasive power of the IRS’s ruling, see, e.g., PSB Holdings, Inc. v. Comm’r, 129 T.C. 131, 142 (2007) (applying the deferential standard of Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct.. 161, 89 L.Ed. 124 (1944)), but also by the regulation’s text and its historical context. By enacting § 466, Congress responded to the IRS’s interpretation of § 1.451-4(a)(l) not by bringing discount coupons within its ambit, but by giving separate authorization to companies to offset the cost of coupons redeemable for “a discount on- the purchase price of merchandise or other tangible property.” In doing so, Congress hewed to, and placed textual emphasis on, the distinction the IRS drew: that benefits redeemable “in” property do not include benefits redeemable for “a discount on the purchase price of’ property.
Second, Giant Eagle claims that fuel-perks! were designed to (and did) generate grocery revenue — not fuel revenue — and that setting off the expected cost of fuel-perks! redemption against grocery sales therefore accords with the purpose of § 1.451 — 4(a)(1), which is “to match sales revenues with the expenses incurred in generating those revenues.” Capital One Fin. Corp. v. Comm’r, 133 T.C. 136, 197 (2009). I have no reason to doubt the company’s representations as to the purpose of the fuelperks! program or the impact it has had on revenues. Accordingly, I agree with Giant Eagle that the Tax Court’s application of § 1.451-4(a)(l) to fu-elperks! led to a result that is at least somewhat incongruent with one of the regulation’s purposes. But this incongruity is the product of a faithful application of the requirements of § 1.451-4(a)(l) to the facts of this case.
Ill
For the reasons stated, I would hold that the 2006 and 2007 taxable year deductions Giant Eagle claimed on accrued-but-not-yet-redeemed fuelperks! neither satisfied the “all events” test nor qualified as offsets to income under § 1.451^4(a)(l). Accordingly, I respectfully dissent.

. 26 U.S.C. § 461(h)(4) (amount need only be “determined with reasonable accuracy”).

. E.g., United States v. Hughes Props., Inc., 476 U.S. 593, 602, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986).

. E.g., id. at 604, 106 S.Ct. 2092.

. Where a liability is fixed and absolute, neither a potential inability of the taxpayer to pay it (due to going out of business, loss of license, or bankruptcy) nor "an extremely remote and speculative possibility” that the liability will never come due negates that the liability is determined in fact. See Hughes Props., 476 U.S. at 601-02, 605-06, 106 S.Ct. 2092.

. In effect, § 1.451-4(a)(l) allows a taxpayer to reduce its tax liability by writing off the expected future cost of such trading stamp and premium coupon redemption — a result the “all events” test otherwise precludes with its prohibition of the deduction of contingent liabilities. See Capital One Fin. Corp. v. Comm’r, 133 T.C. 136, 197 (2009), aff'd sub nom. Capital One Fin. Corp., & Subsidiaries v. Comm’r, 659 F.3d 316 (4th Cir.2011) (referring to § 1.451 — 4(a)(1) as an “exception” to the "all events” test and noting that "taxpayers are entitled to a present deduction for only that portion of the stamps or coupons that they expect to eventually be redeemed”).

. Section 466 was repealed 8 years later by the Tax Reform Act of 1986. Pub.L. No. 99-514, § 823(a), 100 Stat. 2373.