**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3961
_____

GIANT EAGLE, INC.,

Appellant

v.

COMMISSIONER OF INTERNAL REVENUE

On Appeal from the United States Tax Court
(D. C. Civil Action No. 11910-12)
Tax Court Judge:  Honorable Harry A. Haines

Argued on April 29, 2015

Before:  FISHER, HARDIMAN and ROTH, <u>Circuit Judges</u>

(Opinion filed: May 6, 2016)

Robert M. Barnes, Esquire    **(Argued)**
Richard I. Halpern, Esquire
Marcus & Shapira
301 Grant Street
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219

        Counsel for Appellant


Julie C. Avetta, Esquire    **(Argued)**
Jonathan S. Cohen, Esquire
Bethany B. Hauser, Esquire
Gilbert S. Rothenberg, Esquire
United States Department of Justice
Tax Division
950 Pennsylvania Avenue, N.W.
P.O. Box 502
Washington, DC 20044

        Counsel for Appellee

---

O P I N I O N

---

**ROTH**, <u>Circuit Judge</u>:

Benjamin Franklin opined that "in this world nothing can be said to be certain, except death and taxes."[1]  But the advent of the "all events" test renders Franklin's pronouncement at best partially correct.

The Tax Code does not limit the availability of deductions to expenses for which payment is certain.  Rather, accrual method taxpayers are expressly permitted to deduct expenses before they are paid, so long as "all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy."[2]  A codified legal fiction affords taxpayers even greater flexibility in the realm of recurring expenses, for which an anticipated liability may be deemed "incurred" even if the predicate costs are not themselves incurred during the year a deduction is claimed.[3]

Here, by disallowing deductions claimed by a supermarket chain based on rewards shoppers had earned but not yet redeemed, the Tax Court misapplied the "all events" test as it applies to recurring expenses.  For that reason, we will reverse and remand this case to the Tax Court with instructions to grant judgment in favor of Giant Eagle, Inc., and its subsidiaries (collectively, Giant Eagle) on the basis that the claimed deductions are permissible under the "all events" test.

**I.**

---

[1] Letter from Benjamin Franklin to Jean Baptiste Le Roy (Nov. 13, 1789), *in* 10 The Writings of Benjamin Franklin 69 (Albert Henry Smith ed. 1907).

[2] 26 U.S.C. § 461(h)(4).

[3] *Id.* § 461(h)(3)(A).

Giant Eagle operates a chain of retail supermarkets, pharmacies, gas stations, and convenience stores in the Northeastern and Midwestern United States. Giant Eagle uses the accrual method of accounting to determine and report its income tax liability.[4]

**A.**

Giant Eagle's fuel rewards program traces its origins to the supermarket chain's introduction in 1991 of a customer-loyalty program called Advantage Cards. Initially, customers who presented an Advantage Card at checkout received discounts on promotion items and/or entire purchases. Then, in response to skyrocketing gasoline prices in the late 1990s and early 2000s, Giant Eagle opened gasoline stations on the premises of many of its supermarkets, where Advantage Cardholders received discounts on the purchase of gasoline, ranging from three to seven cents per gallon. However, Giant Eagle incurred significant losses on its first few years of gasoline sales, and the fuel discounts failed to increase supermarket traffic.

In April 2004, Giant Eagle revised the Advantage Card program. The new program, called "fuelperks!", linked customers' rewards at the pump to prior grocery purchases, *i.e.*, for every $50 spent on qualifying groceries, an Advantage Cardholder earned a ten cents-per-gallon discount on gas. A brochure distributed to customers set out the program's ground rules, including that "discounts expire on the last day of the month, 3 months after they are earned,"

---

[4] Giant Eagle, Inc., a Pennsylvania corporation, filed a consolidated income tax return accounting for its subsidiaries' revenue and liabilities during each tax year at issue.

4

and that "[t]he promotion is valid for a limited time only and may end at any time without prior notice." Giant Eagle did not in fact end the promotion or revoke any accumulated discounts in 2006 or 2007, the tax years at issue. Moreover, fuelperks! led to a dramatic increase in Giant Eagle's supermarket sales.

### B.

On its 2006 and 2007 corporate income tax returns, Giant Eagle claimed a deduction for the discounts its customers had accumulated but, at year's end, had not yet applied to fuel purchases. Giant Eagle computed the deduction by (1) ascertaining the total dollar amount spent at its supermarkets on discount-qualifying items, (2) dividing that figure by 50 to determine the number of outstanding accumulated discounts, and (3) multiplying the quotient by $.10 to determine the face value of the discounts. Next, Giant Eagle (4) multiplied the discounts' face value by the historical redemption rate of discounts in their expiring month, and (5) multiplied that product by the average number of gallons purchased in a discounted fuel sale.

From the outset of the fuelperks! program, Giant Eagle tracked customers' redemption of accumulated discounts and used the historical averages to determine the amount of the claimed deductions. Thus, it did not base its computations of (4) and (5) on the number of discounts actually redeemed or the number of gallons of gasoline actually sold in the three months after year's end. The Commissioner of Internal Revenue disallowed the deductions for the 2006 and 2007 tax years, which totaled $3,358,226 and $313,490, respectively.

### C.

5

Giant Eagle petitioned the U.S. Tax Court for redetermination of its 2006 and 2007 income tax liabilities on two grounds. First, it argued that the discounts accumulated but not applied by year's end satisfied the "all events" test because Giant Eagle's liability became fixed upon issuance of the discounts. Alternatively, Giant Eagle urged that the accrued discounts be treated as sales-accompanying "trading stamps or premium coupons," enabling it to offset the estimated costs against gross receipts from grocery sales.[5]

The Tax Court rejected both arguments. It found that Giant Eagle's claimed deductions did not satisfy the "all events" test because the purchase of gasoline functioned as a condition precedent to customers' redemption of discounts earned at checkout. Accordingly, the court reasoned, any fuelperks!-related liability became fixed only after customers applied the accumulated discounts to a fuel purchase, which, in the case of the disallowed deductions, occurred after the end of the tax year. Additionally, the Tax Court held that the Treasury Regulation governing "trading stamps" did not apply to the discounts that Giant Eagle customers accrued through fuelperks! because the gasoline discounts were not redeemable in "merchandise, cash, or other property," as required under a 1978 revenue ruling.[6] For these reasons, the Tax Court sustained the Commissioner's deficiency determinations for both tax years.

Giant Eagle appealed.

---

[5] *See* Treas. Reg. § 1.451-4(a)(1).
[6] *See* Rev. Rul. 78-212, 1978-1 C.B. 139.

6

**II.**[7]

The "all events" test derives from dictum in a 1926 Supreme Court decision, explaining that a liability may accrue even "in advance of the assessment of a tax" if "all the events [] occur which fix the amount of the tax and determine the liability of the taxpayer to pay it."[8]  The test has since been refined, prescribed as a Treasury Regulation, and eventually codified.  Today, 26 U.S.C. § 461 and its implementing regulations limit accrual method taxpayers' deductibility of liabilities as follows:

> Under an accrual method of accounting, a liability . . . is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability.[9]

The Treasury Secretary prescribed a supplementary regulation defining "economic performance" in the context of rebates and refunds:

---

[7] The Tax Court had jurisdiction over Giant Eagle's petition pursuant to 26 U.S.C. §§ 6213(a), 6214(a), and 7442.  We exercise exclusive appellate jurisdiction under 26 U.S.C. § 7482(a)(1).  We review *de novo* whether a taxpayer has satisfied the "all events" test, *see In re Harvard Indus.*, 568 F.3d 444, 450 (3d Cir. 2009), but we review the Tax Court's factual findings for clear error, *see Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425, 447 n.48 (3d Cir. 2012).

[8] *United States v. Anderson*, 269 U.S. 422, 441 (1926).

[9] Treas. Reg. § 1.461-1(a)(2)(i).

If the liability of a taxpayer is to pay a rebate, refund, or similar payment to another person (whether paid in property, money, or as a reduction in the price of goods or services to be provided in the future by the taxpayer), economic performance occurs as payment is made to the person to which the liability is owed.[10]

Nonetheless, "certain recurring items" are subject to a more relaxed version of the "all events" test:

Notwithstanding [the general rule that "the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs"][11] an item shall be treated as incurred during any taxable year if—

(i) the all events test with respect to such item is met during such taxable year (determined without regard to [26 U.S.C. § 461(h)(1)]),

(ii) economic performance with respect to such item occurs within the shorter of—

---

[10] *Id.* § 1.461-4(g)(3).
[11] 26 U.S.C. § 461(h)(1).

(I) a reasonable period after the close of such taxable year,[12] or

(II) 8 ½ months after the close of such taxable year,

(iii) such item is recurring in nature and the taxpayer consistently treats items of such kind as incurred in the taxable year in which the requirements of clause (i) are met, and

(iv) either—

(I) such item is not a material item, or

(II) the accrual of such item in the taxable year in which the requirements of clause (i) are met results in a more proper match against income than accruing such item in the taxable year in which economic performance occurs.[13]

For purposes of the "recurring item" exception, "the all events test is met with respect to any item if all events have occurred which determine the fact of liability and the amount

---

[12] A Treasury Regulation defines a "reasonable period" as "[t]he date the taxpayer files a timely (including extensions) return for that taxable year." Treas. Reg. § 1.461-5(b)(1)(ii)(A).

[13] 26 U.S.C. § 461(h)(3)(A).

of such liability can be determined with reasonable accuracy."[14]

The Commissioner does not contest that fuelperks! rewards qualify as both "a rebate, refund, or similar payment" and a "recurring expense" subject to the less onerous "economic performance" requirement. Moreover, the Commissioner concedes that Giant Eagle calculated its anticipated fuelperks!-related liability "with reasonable accuracy," and that economic performance had occurred by the time of Giant Eagle's tax filing. Thus, the only issue on appeal is whether "the fact of liability" was fixed at year's end[15] -- that is, before the end of the tax year, had Giant Eagle become liable to pay the fuelperks! 10-cent discount to its customers who had purchased qualifying groceries with their Advantage Cards.

## A.

Two seminal Supreme Court decisions frame our discussion of the "all events" test's fixed liability requirement. In its first decision applying the "all events" test after its codification, the Court held, in *United States v. Hughes Properties, Inc.*, that a casino operator was entitled to deduct the annual increase in its progressive jackpot payoff amounts, including for jackpots not won by year's end.[16] While the Court acknowledged that there remained an

---

[14] *Id.* § 461(h)(4).

[15] Notably, the "matching requirement" contained in 26 U.S.C. § 461(h)(3)(A)(iv)(II) is "deemed satisfied . . . [i]n the case of a liability described in [Treasury Regulation § 1.461-4](g)(3) (rebates and refunds)." Treas. Reg. § 1.461-5(b)(5)(ii).

[16] 476 U.S. 593, 601-02 (1986).

"extremely remote and speculative possibility [] that the jackpot might never be won," it nonetheless concluded that the anticipated liability was "fixed" under Nevada law, which "forbade reducing the indicated payoff without paying the jackpot."[17]

One year later, in *United States v. General Dynamics Corp.*, the Court disallowed deductions claimed by a commercial taxpayer on the basis of its obligation to reimburse employees for medical expenses incurred by year's end, but not yet submitted for reimbursement on an official claim form.[18] The Court reasoned that because the taxpayer was "liable to pay for covered medical services *only* if properly documented claims forms were filed," "[t]he filing of the claim [was] thus a true condition precedent to liability on the part of the taxpayer."[19] Though decided one year earlier, *Hughes Properties* expressly survives *General Dynamics*. Whereas the casino operator in *Hughes Properties* "could not escape" its "fixed liability for the jackpot . . . as a matter of state law,"[20] the *General Dynamics* Court emphasized that employees' "[m]ere receipt of services . . . does not, in our judgment, constitute the last link in the chain of events creating [employer] liability."[21]

---

[17] *Id.* at 601.

[18] 481 U.S. 239, 243-45 (1987).

[19] *Id.* at 243-44 & n.5 ("[A] taxpayer may not deduct a liability that is contingent or contested. Nor may a taxpayer deduct an estimate of an anticipated expense, no matter how statistically certain, if it is based on events that have not occurred by the close of the taxable year." (internal citations omitted)).

[20] 476 U.S. at 601-02.

[21] *Gen. Dynamics*, 481 U.S. at 244-45; *but see id.* at 249 (O'Connor, J., dissenting) ("In my view, the circumstances of this case differ little from those in *Hughes Properties*.")

Two of our sister circuit courts of appeals have helpfully construed these ostensibly discordant decisions. Most recently, in *Massachusetts Mutual Life Insurance Co. v. United States*, the Federal Circuit Court of Appeals held that a life insurance company was entitled to claim deductions on the basis of future policyholder dividends, guaranteed by the company's board of directors.[22] The court explained that under *Hughes Properties*, the dividends constituted a fixed liability as of the board's adoption of resolutions guaranteeing their payment, despite ensuing uncertainty as to which policyholders were entitled to the payments and the amount each policyholder would receive.[23] In the court's view, *General Dynamics* did not disturb *Hughes Properties*' holding that a liability may be fixed in fact without being fixed as to the amount or date of payment; instead, the later decision merely precluded characterization of anticipated liabilities as "fixed" if "subject to some event that must occur for a liability to become due."[24] Because boardroom resolutions conclusively established the *fact* of the life insurance provider's liability for future dividends, the court held that the anticipated liabilities were not subject to a condition precedent and therefore qualified as deductible expenses under the "all events" test.[25]

---

[22] 782 F.3d 1354, 1364-65 (Fed. Cir. 2015).

[23] *See id.* at 1365 ("[N]ot knowing the ultimate recipient of the payment does not prevent a liability from becoming fixed." (citing, *inter alia*, *Hughes Props.*, 476 U.S. at 601)).

[24] *Id.* (citing *Gen. Dynamics*, 481 U.S. at 244).

[25] *See id.* at 1365, 1371. The Federal Circuit distinguished a recent Second Circuit decision, *N.Y. Life Ins. Co. v. United States*, 724 F.3d 256 (2d Cir. 2013), disallowing policyholder dividend deductions on the ground that in that case payment

12

The Ninth Circuit Court of Appeals also ruled on the issue of the "all events" test in *Gold Coast Hotel & Casino v. United States*.[26] Relying on *Hughes Properties'* acknowledgment of an "extremely remote and speculative possibility" that the deductible anticipated liability would never be paid, the court announced that, "for purposes of the 'all events' test, what is critical is the existence of an *absolute liability*, not an *absolute certainty* the liability will be discharged by payment."[27] Thus, the court allowed a casino to deduct the value of its gamblers' accumulated but as-yet-unredeemed "slot club" rewards points, despite the high likelihood that some of the points accounted for as deductions would never be redeemed.[28] Unlike the filing of a claim form, gamblers' demand for payment was considered a mere technicality which did not involve third parties or require "proof of their right to payment," and therefore did not constitute "a condition precedent to fixing Gold Coast's liability for the value of accumulated slot club points."[29]

Our sister courts' approaches are consistent with our only reported decision on the subject. In *Lukens Steel Co. v.*

---

of the dividends was subject to various conditions precedent. *See Mass. Mut.*, 782 F.3d at 1364. Unlike the ironclad payment guarantees resolved by the life insurance provider's board of directors in *Massachusetts Mutual*, *id.* at 1365, the annual dividends credited to policyholders' accounts in *New York Life* would not be paid out until the policies' anniversary date, and only then if policyholders remained current on all premium payments, 724 F.3d at 258-59, 263-64.

[26] 158 F.3d 484 (9th Cir. 1998).

[27] *Id.* at 489.

[28] *See id.* at 490-91 ("[T]he data in the record suggests that only 69% of slot club points are actually redeemed.").

[29] *See id.* at 490 (distinguishing *Gen. Dynamics*, 481 U.S. at 244).

13

*Commissioner*, a case that predated codification of the "all events" test, we held that an accrual method taxpayer was entitled to deduct payments credited to a "contingent liability account," even though they "would not be paid out immediately or at a specified time."[30] Critically, however, under the terms of a collective bargaining agreement, "[i]t was not possible for Lukens to cancel the contingent liability account without paying" the credited amounts.[31] Because the taxpayer irrevocably committed to the payments during the tax year at issue, it was entitled to deduct corresponding future liabilities that "would be paid in a reasonable period of time."[32]

## B.

As in *Lukens Steel*, here we determine whether the taxpayer's anticipated liability was fixed at year's end with reference to contract law principles.[33] Specifically, Giant

---

[30] 442 F.2d 1131, 1134-35 (3d Cir. 1971) ("In similar situations it has been held that indeterminancy as to the time or amount of payment does not destroy the deductibility of an accrued item when the amount of liability is absolutely fixed." (citations omitted)).

[31] *Id.* at 1134.

[32] *Id.* at 1135; *accord Wash. Post Co. v. United States*, 405 F.2d 1279, 1284 (Ct. Cl. 1969) ("[W]hen a group liability is involved, it is the certainty of the liability which is of the utmost importance in the all events test, and not necessarily either the certainty of the time over which payment will be made or the identity of the payees." (internal quotation marks omitted)).

[33] *Accord* Rev. Rul. 98-39, 1998-2 C.B. 198 ("Where a taxpayer's obligations are set forth in a written agreement, the terms of the agreement are relevant in determining the events that fix the taxpayer's obligation to pay."). To be sure, noncontractual obligations such as those contained in a statute or regulation may serve an analogous function, *see Hughes Props.*, 476 U.S. at 596 (Nevada Gaming Commission

14

Eagle characterizes its issuance of fuelperks! rewards as a unilateral contract formed at checkout, which conferred instant liability on the supermarket chain to its customers for the rewards they accrued.

Unlike bilateral contracts, which are premised on reciprocal promises, "unilateral contracts . . . involve only one promise and are formed when one party makes a promise in exchange for the other party's act or performance. Significantly, a unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance."[34]  A unilateral contract also differs from an unenforceable contingent gift in that a reasonable person would understand that she could accept the offer and reap the promised reward simply by performing the task specified.[35] Thus, a Pennsylvania court held that a car dealership, advertising a discount on a future car purchase if a hole-in-one was made on the ninth hole of a local golf course, was obligated to honor its "offer" when a golfer finally aced the hole—despite the dealership's stated intention to end the promotion two days earlier.[36]  The court reasoned, "[i]t is the manifested intent of the offeror and not his subjective intent which determines the persons having the power to accept the offer."[37]  Because "the offeror's manifested intent, as it

---

regulation); *Gold Coast Hotel*, 158 F.3d at 488 & n.6 (same), but the "all events" test does not require that liabilities be fixed by such external sources.

[34] *First Home Sav. Bank, FSB v. Nernberg*, 648 A.2d 9, 14 (Pa. Super. Ct. 1994) (internal citations omitted).

[35] *See Cobaugh v. Klick-Lewis, Inc.*, 561 A.2d 1248, 1249-50 (Pa. Super. Ct. 1989); *see also Pacitti v. Macy's*, 193 F.3d 766, 774-75 (3d Cir. 1999).

[36] *Cobaugh*, 561 A.2d at 1250.

[37] *Id.* at 1251 (citing Restatement (Second) of Contracts § 29 (1981)).

appeared from signs posted at the ninth tee, was that a hole-in-one would win the car," the dealer was liable in accordance with such reasonable expectations.[38]

So too might a Giant Eagle customer have reasonably presumed the redeemability of accumulated fuelperks! rewards, as provided by the well-publicized "Simple Program Guide":



---

[38] *Id.*

The brochure distributed to Advantage Cardholders also included fine print providing, *inter alia*, that "discounted fuel cannot exceed 30 gallons and discounts must be used in full on one vehicle in one transaction"; "[t]he promotion is valid for a limited time and may end at any time without prior notice"; and "fuelperks! discounts expire 3 months after the last day of the month in which they're earned." But none of the published program parameters suggested that Giant Eagle reserved the right to retract rewards that customers had already accrued. Indeed, in the entire history of Giant Eagle's fuel rewards program, "[n]o such retroactive termination ever occurred, or was even contemplated."[39]

Like the golfer who teed off with a promise of reward in mind, a customer anticipated the promised fuel discounts when deciding to shop at Giant Eagle in the first place – and thus deciding not to shop at a different store. Because she was then aware that she could apply the discounts as advertised if she spent fifty dollars on supermarket purchases using her Advantage Card, she was indeed a party to a unilateral contract with Giant Eagle. Liability therefore attached upon her performance, *i.e.*, at checkout.

For purposes of the "all events" test's fixed liability prong, it is irrelevant that neither the total *amount* of Giant Eagle's anticipated liability nor the identity of all the

---

[39] *See Hughes Props.*, 476 U.S. at 604-05 ("None of the components that make up this parade of horribles, of course, took place here."). Nor could Giant Eagle have terminated the rewards retroactively "without an explicit reservation of the power to do so." *Abbott v. Schnader, Harrison, Segal & Lewis, LLP*, 805 A.2d 547, 558-60 (Pa. Super. Ct. 2002); *see Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 287 (3d Cir. 1995).

customers who eventually applied discounts toward gasoline purchases could be conclusively identified at year's end.[40] And while there remained an "extremely remote and speculative possibility" that the amount of Giant Eagle's claimed deductions would overstate the value of the rewards its customers ultimately redeemed,[41] Giant Eagle significantly mitigated that risk by tracking its customers' monthly redemption rates and offsetting the deductions accordingly to account for prospective non-redeemers. Giant Eagle amply demonstrated the existence—as of year's end—of both an absolute liability *and* a near-certainty that the liability would soon be discharged by payment. The chance of non-redemption had been calculated by Giant Eagle "with reasonable accuracy" as conceded by the Commissioner. The "all events" test demands no more. We hold, therefore, that following *Hughes Props.* and *Lukens Steel*, Giant Eagle was entitled to deduct fuelperks!-related liabilities incurred during the tax years at issue.

## III.

By disallowing deductions claimed on the basis of established recurring expenses, the Tax Court effectively obliterated the distinction between two accounting methods expressly authorized by the Tax Code.[42] The extent to which

---

[40] *See Lukens Steel*, 442 F.2d at 1134-35 ("[I]ndeterminancy as to the . . . amount of payment does not destroy the deductibility of an accrued item when the amount of liability is absolutely fixed."); *Mass. Mut.*, 782 F.3d at 1365 ("[N]ot knowing the ultimate recipient of the payment does not prevent a liability from becoming fixed." (citing, *inter alia*, *Hughes Props.*, 476 U.S. at 601)).

[41] *See Hughes Props.*, 476 U.S. at 601.

[42] *See* 26 U.S.C. § 446(c)(2). The accrual method of accounting differs fundamentally from its cash counterpart. Whereas businesses that

cash and accrual methods of accounting sometimes yield different deductions is a byproduct of the Tax Code's design. So long as a taxpayer consistently adheres to one accounting method, the Code is agnostic as to the benefit or hardship wrought by his selection.[43]

For the foregoing reasons, we will reverse the Tax Court's order sustaining the Commissioner's deficiency determinations and remand this case with instructions to grant judgment in favor of Giant Eagle on the ground that the claimed deductions are permissible under the "all events" test.[44]

---

choose the latter method refrain from counting revenues until they are received and expenses until they are paid, those using the accrual method account for transactions when they occur, regardless of when the money, goods, or services actually change hands.

[43] *See* 26 U.S.C. § 446(a), (b) (providing that the Treasury Department may only recalculate a taxpayer's liabilities without respect to the accounting method regularly used in keeping his books if "no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income").

[44] Because we are reversing on the basis of the Tax Court's misapplication of the "all events" test, we express no opinion concerning the soundness of its alternative holding that the Treasury Regulation governing "trading stamps" is inapplicable to fuelperks! rewards accompanying Giant Eagle supermarket purchases. Nor do we discuss whether the Tax Court accorded Revenue Ruling 78-212 supererogatory deference. *Cf. In re WorldCom, Inc.*, 723 F.3d 346, 357 (2d Cir. 2013); *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 454 & n.9 (5th Cir. 2008); *Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 (6th Cir. 2003); *Omohundro v. United States*, 300 F.3d 1065, 1067-68 (9th Cir. 2002); *Del Commercial Props., Inc. v. Comm'r*, 251 F.3d 210, 214 (D.C. Cir. 2001).

*Giant Eagle, Inc. v. Commissioner of Internal Revenue*
No. 14-3961

HARDIMAN, *Circuit Judge*, dissenting.

The Court reverses the Tax Court's order after finding that, at the close of the 2006 and 2007 taxable years for which Giant Eagle deducted anticipated fuelperks! expenses, "all events ha[d] occurred which determine[d] the fact" that it was liable to pay those expenses. 26 U.S.C. § 461(h)(4). Because I believe Giant Eagle's liabilities were not determined until fuelperks! were redeemed, I respectfully dissent.

I

The law applicable to this case is relatively clear. An accrual method taxpayer need not ascertain the *amount* of a liability,[1] to *whom* it is owed,[2] or *when* it will be paid[3] in order for events to "determine the fact" of the liability and render it deductible. Instead, all that is required is that it became "fixed and absolute" in the taxable year for which the deduction is sought.[4] *United States v. Hughes Props., Inc.*, 476 U.S. 593, 600 (1986) (quotation omitted); *see also, e.g.*, *Gold Coast Hotel & Casino v. United States*, 158 F.3d 484, 489 (9th Cir. 1998) ("[F]or purposes of the 'all events' test, what is critical is the existence of an absolute liability . . . ." (emphasis removed)).

Several cases explain what it means for a liability to be fixed and absolute. In *United States v. Hughes Properties, Inc.*, a casino established the fact of its liability to make an additional slot machine payout by raising its progressive

_____

[1] 26 U.S.C. § 461(h)(4) (amount need only be "determined with reasonable accuracy").

[2] *E.g., United States v. Hughes Props., Inc.*, 476 U.S. 593, 602 (1986).

[3] *E.g., id.* at 604.

[4] Where a liability is fixed and absolute, neither a potential inability of the taxpayer to pay it (due to going out of business, loss of license, or bankruptcy) nor "an extremely remote and speculative possibility" that the liability will never come due negates that the liability is determined in fact. *See Hughes Props.*, 476 U.S. at 601–02, 605–06.

1

jackpot under a Nevada law that prescribed "a fixed liability for the jackpot which it could not escape." 476 U.S. at 602. In *Massachusetts Mutual Life Insurance Co. v. United States*, an insurance company determined the fact of its liability to make dividend payments to a class of policyholders after the board of directors "passed an absolute resolution to pay the guaranteed dividend and . . . at least some policyholders were already qualified recipients of that guarantee." 782 F.3d 1354, 1365 (Fed. Cir. 2015). And in *Lukens Steel Co. v. Commissioner of Internal Revenue*, a steel company established the fact of its liability to transfer funds from a contingent liability account to its employees by paying into the account under a collective bargaining agreement that obligated funds "to be used to pay benefits to [the company's] eligible employees" and specified that "[i]n no event could the [account] be cancelled by" the company. 442 F.2d 1131, 1134–35 (3d Cir. 1971). In each of these cases, events took place under a set of rules—imposed by law or contract—that established that the taxpayer was liable and would remain liable until payment was made.

In an effort to identify rules that established Giant Eagle's liability, the Majority turns to Pennsylvania's common law of contracts and the terms and conditions of the fuelperks! program. Specifically, it applies the Pennsylvania Superior Court's decision in *Cobaugh v. Klick-Lewis, Inc.* to show that Giant Eagle entered into a unilateral contract with each shopper at checkout, thereby incurring liability to provide discounted gas at that time. 561 A.2d 1248 (Pa. Super. Ct. 1989). The Majority notes that accrued fuelperks! were not expressly permitted to be, and never have been, retracted by Giant Eagle. Based on these observations, the Majority concludes that "Giant Eagle amply demonstrated the existence—as of year's end—of both an absolute liability *and* a near-certainty that the liability would soon be discharged by payment." Maj. Typescript at 16. While I agree with the Majority's observations, I disagree with its conclusions.

We have elsewhere applied *Cobaugh* for the proposition that an advertisement promising an opportunity to earn a benefit in exchange for performance can give rise to a unilateral contract. *Pacitti v. Macy's*, 193 F.3d 766, 772–73 (3d Cir. 1999) (applying *Cobaugh* to an offer for "the

2

opportunity of becoming 'Broadway's New "Annie"'"'"). Accordingly, I am constrained by precedent to agree with my colleagues that, under *Cobaugh*, Giant Eagle's advertisements constituted an offer to its shoppers to enter into a unilateral contract for the opportunity to redeem fuelperks! for discounted gas by purchasing $50 or more in groceries. *See Hughes Props.*, 476 U.S. at 601–02 (applying state law to determine whether a casino's liability was fixed). Qualifying purchases met the complete performance requirement and "[l]iability therefore attached upon . . . performance, *i.e.*, at checkout." Maj. Typescript at 15.

Nonetheless, the liabilities that accrued to Giant Eagle on account of its fuelperks! program were not absolute. The casino in *Hughes Properties*, the insurance company in *Massachusetts Mutual*, and the steel company in *Lukens Steel* all operated under a set of rules that offered no hope of escape from their fixed liabilities. In each case, those liabilities had to remain on their books until discharged by payment. Here, in contrast, Giant Eagle made each liability temporary by providing that "fuelperks! discounts expire 3 months after the last day of the month in which they're earned." App. 1161. If a shopper failed to redeem fuelperks! within that timeframe, the discounts were lost and Giant Eagle had no obligation to honor a belated attempt at redemption. After acknowledging this fact, the Majority offers reasons why we should nonetheless conclude that Giant Eagle faced "an absolute liability." Maj. Typescript at 16. After careful consideration of those reasons, I remain unconvinced.

First, the Majority emphasizes that "none of the published program parameters suggested that Giant Eagle reserved the right to retract rewards that customers had already accrued" and "[n]o such retroactive termination ever occurred, or was even contemplated." *Id.* at 14–15 (quotation omitted). While these statements are undoubtedly true, they do not change the fact that the company's liabilities were extinguishable by another means. Like retraction, expiration has the effect of eliminating liability for the benefit of Giant Eagle.

Second, the Majority notes that "it is irrelevant that neither the total amount of Giant Eagle's anticipated liability

3

nor the identity of all the customers who eventually applied discounts toward gasoline purchases could be conclusively identified by year's end." *Id.* at 15 (emphasis removed). In my view, this comment reveals an analytical error, *i.e.*, a conversion of Giant Eagle's individual liabilities into a group liability. In order to establish that Giant Eagle faced a fixed liability, the Majority applies *Cobaugh* to conclude that the company entered into a unilateral contract at checkout with— and therefore became liable to provide discounted gas to— each shopper. Consequently, its liabilities were several and fixed on an individual basis. But the Majority later departs from that reality by treating the company's numerous individual liabilities as an amalgamation. *See* Maj. Typescript at 15 (citing *Lukens Steel* and *Massachusetts Mutual*, cases that each involved a single group liability); *see also id.* at 16 ("Giant Eagle amply demonstrated the existence—as of year's end—of . . . *an absolute liability*" (emphasis added)). This errant tack is critical because whether liability is fixed on an individual or collective basis is a "significant" fact with the potential to "dictate . . . different outcome[s]" in our cases. *Mass. Mut.*, 782 F.3d at 1364. Accordingly, I cannot agree with the Majority's analysis, which perceives Giant Eagle's liability as being fixed both on an individual and collective basis.

As I see it, the question for our resolution is whether Giant Eagle's liability to *any individual shopper* with accrued-but-not-yet-redeemed fuelperks! was certain to continue under the rules applicable to that liability until it was paid. Because one of those rules allowed for the expiration of each shopper's fuelperks! (and Giant Eagle's corresponding liability to that shopper), the answer is plainly "no." While Giant Eagle became *liable* to a shopper at checkout, it did not become *absolutely* liable to that shopper unless and until the shopper redeemed fuelperks! prior to their expiration. For that reason, I would hold that, at the close of the 2006 and 2007 taxable years, Giant Eagle faced many fixed liabilities for yet-to-be-redeemed fuelperks!, but none that were "determine[d] in fact" because each was contingent upon future redemption by the shopper.

4

*  *  *

Had Giant Eagle not included an expiration provision in its terms and conditions, I would be inclined to agree with my colleagues that the company incurred a fixed and absolute liability to each shopper at checkout. In that case, we would face the difficult task of determining whether historical redemption data and other evidence reveal more than "an extremely remote and speculative possibility" that any given shopper would fail to timely redeem discounts and how much bearing, if any, the answer to that question has on whether the company's liabilities were "determine[d] in fact." *Hughes Props.*, 476 U.S. at 601; *see Gold Coast Hotel & Casino*, 158 F.3d at 489 (interpreting *Hughes Properties* to require at least a "reasonable expectancy" that the liability will be discharged by payment of cash or its equivalent). But the fact that the store did include an expiration provision—thereby conditioning its liability to each shopper upon fuelperks! redemption at a Giant Eagle-owned gas station within approximately 3 months' time—made "redemption" a condition precedent to the establishment of an absolute liability. Because that event had not occurred by the close of the 2006 or 2007 taxable years with respect to the deductions Giant Eagle claimed on accrued-but-not-yet-redeemed fuelperks!, I would hold that the "all events" test was not satisfied and those anticipated expenses were not deductible.

II

In light of my view regarding Giant Eagle's failure to satisfy the "all events" test, I turn to its alternative argument. Giant Eagle contends that its deductions were the functional equivalent of offsets to income permissible under a longstanding exception to the "all events" test. Pursuant to Treasury Regulation § 1.451–4(a)(1), "[i]f an accrual method taxpayer issues trading stamps or premium coupons with sales" that are redeemable "in merchandise, cash, or other property," the taxpayer should "subtract from gross receipts" the estimated cost of redemption of those stamps and coupons in calculating taxable income.[5] While it is undisputed that

---

[5] In effect, § 1.451–4(a)(1) allows a taxpayer to reduce its tax liability by writing off the expected future cost of such

5

fuelperks! are "issue[d] . . . with sales" of groceries, the parties contest the exception's two other requirements: (1) whether fuelperks! qualify as "trading stamps or premium coupons" and (2) whether fuelperks! are redeemable "in merchandise, cash, or other property." Because fuelperks! are not redeemable "in merchandise, cash, or other property," I agree with the Tax Court and would hold that § 1.451–4(a)(1) does not authorize Giant Eagle's deductions.

In a 1978 revenue ruling, the IRS interpreted the phrase "in merchandise, cash, or other property" to imply an "unconditional" right of redemption, meaning that in order for a stamp or coupon to fall under § 1.451–4(a)(1) it must be "redeemable without additional consideration from the consumer." Rev. Rul. 78-212, 1978-1 C.B. 139, *2 (1978). For that reason, the IRS advised a manufacturer that it "may not avail itself of [§ 1.451–4(a)(1)]" to account for the redemption of "coupons that entitle consumers to a discount on the sales price of certain products purchased in the future." *Id.* at *1. Such coupons are not redeemable "in merchandise, cash, or other property" because their redemption is "conditioned on an additional purchase." *Id.* at *2.

In response to Revenue Ruling 78-212, Congress added § 466 to the Internal Revenue Code. That section authorized[6] taxpayers to offset revenue with respect to a limited class of discount coupons—*i.e.*, those which, *inter alia*, were redeemable for "a discount on the purchase price of

---

trading stamp and premium coupon redemption—a result the "all events" test otherwise precludes with its prohibition of the deduction of contingent liabilities. *See Capital One Fin. Corp. v. Comm'r*, 133 T.C. 136, 197 (2009), *aff'd sub nom. Capital One Fin. Corp., & Subsidiaries v. Comm'r*, 659 F.3d 316 (4th Cir. 2011) (referring to § 1.451–4(a)(1) as an "exception" to the "all events" test and noting that "taxpayers are entitled to a present deduction for only that portion of the stamps or coupons that they expect to eventually be redeemed").

[6] Section 466 was repealed 8 years later by the Tax Reform Act of 1986. Pub. L. No. 99-514, § 823(a), 100 Stat. 2373.

merchandise or other tangible personal property." Treas. Reg. § 1.466-1(c)(1). In other words, in reconciling (1) its interest in the ability of companies to offset the cost of certain discount coupons with (2) the IRS's interpretation of § 1.451–4(a)(1) which precluded such offsets, Congress chose not to broaden the IRS's interpretation. Instead, Congress passed a law which independently authorized those offsets and, in doing so, expressly drew a distinction between redemption *in* property (the nature of redemption that falls within the ambit of § 1.451–4(a)(1)) and redemption *of a discount on the purchase price of* property (the nature of redemption addressed by § 466)—a distinction it has drawn in other areas as well. *See* Treas. Reg. § 1.461–4(g)(3) (explaining that a "rebate, refund, or similar payment" can be paid "*in* property, money, or *as a reduction in the price of* goods or services" (emphasis added)).

As advertised, a fuelperks! reward entitled its holder to "10¢ off every gallon of gas on your next fill-up at GetGo." App. 1161. Therefore, the benefits provided by fuelperks! were discounts on the purchase price of gasoline, not an entitlement to gasoline itself or the discount's cash value. This is true even though fuelperks! could be accumulated and redeemed *en masse* for free gas. In those situations, shoppers did not exchange fuelperks! for gas as such, but rather for a 100% discount on the price of gas—a functional equivalent to be sure, but reflective of an important distinction respecting the nature of fuelperks! redeemability. It is this nature of redeemability—*i.e.*, that fuelperks! can be exchanged only for discounts—that leads me to conclude that fuelperks! were not redeemable "in merchandise, cash, or other property." Giant Eagle asks us to reject this conclusion for two reasons, neither of which I find persuasive.

First, Giant Eagle argues that "discounts against gas" count as "other property" within the meaning of § 1.451–4(a)(1) and the IRS's contrary interpretation was "mistakenly viewed as persuasive" by the Tax Court. Giant Eagle Br. 60. I disagree because the notion that the phrase "in merchandise, cash, or other property" categorically excludes coupons redeemable for discounts is supported not only by the persuasive power of the IRS's ruling, *see, e.g.*, *PSB Holdings, Inc. v. Comm'r*, 129 T.C. 131, 142 (2007) (applying the

7

deferential standard of *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)), but also by the regulation's text and its historical context. By enacting § 466, Congress responded to the IRS's interpretation of § 1.451–4(a)(1) not by bringing discount coupons within its ambit, but by giving separate authorization to companies to offset the cost of coupons redeemable for "a discount on the purchase price of merchandise or other tangible property." In doing so, Congress hewed to, and placed textual emphasis on, the distinction the IRS drew: that benefits redeemable "in" property do not include benefits redeemable for "a discount on the purchase price of" property.

Second, Giant Eagle claims that fuelperks! were designed to (and did) generate *grocery* revenue—not *fuel* revenue—and that setting off the expected cost of fuelperks! redemption against grocery sales therefore accords with the purpose of § 1.451–4(a)(1), which is "to match sales revenues with the expenses incurred in generating those revenues." *Capital One Fin. Corp. v. Comm'r*, 133 T.C. 136, 197 (2009). I have no reason to doubt the company's representations as to the purpose of the fuelperks! program or the impact it has had on revenues. Accordingly, I agree with Giant Eagle that the Tax Court's application of § 1.451–4(a)(1) to fuelperks! led to a result that is at least somewhat incongruent with one of the regulation's purposes. But this incongruity is the product of a faithful application of the requirements of § 1.451–4(a)(1) to the facts of this case.

III

For the reasons stated, I would hold that the 2006 and 2007 taxable year deductions Giant Eagle claimed on accrued-but-not-yet-redeemed fuelperks! neither satisfied the "all events" test nor qualified as offsets to income under § 1.451–4(a)(1). Accordingly, I respectfully dissent.